[No. G013485. Fourth Dist., Div. Three. Jan. 19, 1994.]

MARY MORMILE et al., Plaintiffs and Respondents, v. ALEXANDER SINCLAIR, Defendant and Appellant.

**COUNSEL**

Baker, Silberberg & Keener, Steven R. Van Sicklen, Schmid & Norek, Susan H. Schmid and Denise H. Greer for Defendant and Appellant.

Lapping & Sturm and Edward W. Sturm for Plaintiffs and Respondents.

## Opinion

SONENSHINE, J.—Alexander Sinclair, M.D., appeals from an order denying his petition to compel arbitration of Gary Mormile's loss of consortium claim. We reverse.

### Discussion

When Mary Mormile first consulted with Sinclair for medical treatment, she signed a physician/patient agreement which provided inter alia: "All Claims Must Be Arbitrated: It is the intention of the parties that this agreement bind all parties whose claims may arise out of or relate to treatment or services provided by the physician, including any spouse or heirs of the patient." Later, when she became dissatisfied with Sinclair's treatment, Mary filed a medical malpractice lawsuit, in which her husband, Gary, asserted a loss of consortium cause of action. Sinclair's petition to compel arbitration was granted as to Mary, but denied as to Gary, the court stating: "[I]n spite of certain cases cited, which I don't think are applicable . . . whatever Mrs. Mormile signed is not, absolutely not binding on him. I don't see how it could be." As we will discuss, the court erred in refusing to compel Gary to arbitrate his claim against Sinclair.

### I

Code of Civil Procedure[1] section 1295 is part of the Medical Injury Compensation Reform Act of 1987. It "was enacted . . . to alleviate the escalating cost of medical malpractice insurance premiums (and resulting problems of health care availability) due to the surge of medical malpractice actions and high jury awards. [Citations.]" (*Rosenfield* v. *Superior Court* (1983) 143 Cal.App.3d 198, 203 [191 Cal.Rptr. 611].) It authorizes medical services contracts which require arbitration of disputes relating to professional negligence of a health care provider. A medical services arbitration agreement must contain statutorily prescribed language,[2] and, if in compliance with the statute, it will not be deemed "a contract of adhesion, nor unconscionable nor otherwise improper." (§ 1295, subd. (e).)

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise stated.

[2] The first article of a medical services contract providing for arbitration must state: "It is understood that any dispute as to medical malpractice that is as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered, will be determined by submission to arbitration as provided by California law, and not by a lawsuit or resort to court process except as California law provides for judicial review of arbitration proceedings. Both parties to this contract, by entering into it, are giving up their constitutional right to have any such dispute

## II

 The issue before us is whether Mary's agreement to arbitrate claims arising out of Sinclair's professional negligence binds Gary, who never signed the agreement. We note arbitration agreements are enforced with regularity against nonsignatory parties. As stated in *Keller Construction Co.* v. *Kashani* (1990) 220 Cal.App.3d 222, 225-226 [269 Cal.Rptr. 259], minors are bound by a parent's contract to arbitrate medical malpractice claims with a group health plan (*Doyle* v. *Giuliucci* (1965) 62 Cal.2d 606, 607-608 [43 Cal.Rptr. 697, 401 P.2d 1]); state employees who have never agreed to arbitrate their claims are bound to do so when a state employer has entered into a medical services contract containing an arbitration provision (*Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 702, 704, 709 [131 Cal.Rptr. 882, 552 P.2d 1178]); where a husband's application for health insurance for himself and his wife contains an arbitration provision, the nonsignatory wife is required to arbitrate her wrongful death claim (*Hawkins* v. *Superior Court* (1979) 89 Cal.App.3d 413, 415-416 [152 Cal.Rptr. 491]); the parents' agreement to arbitrate claims against a group health provider is binding on an infant, even for *in utero* injuries (*Wilson* v. *Kaiser Foundation Hospitals* (1983) 141 Cal.App.3d 891, 893-894 [190 Cal.Rptr. 649]); and the wrongful death claims of nonsignatory heirs of a member of a group health plan must be arbitrated according to the provisions of the subscriber's agreement. (*Herbert* v. *Superior Court* (1985) 169 Cal.App.3d 718, 720-721 [215 Cal.Rptr. 477].) Moreover, by statute, where parents have signed for medical services rendered to a minor, the agreement may not be disaffirmed. (§ 1295, subd. (d).) And the result is the same even if it is the unemancipated minor, rather than the parent, who has signed. (*Michaelis* v. *Schori* (1993) 20 Cal.App.4th 133, 138 [24 Cal.Rptr.2d 380].)

 To date, this district has not had to decide whether a patient can bind his or her nonsignatory spouse to arbitrate a loss of consortium claim against a health care provider. However, the question is not one of first impression in California. In *Gross* v. *Recabaren* (1988) 206 Cal.App.3d 771 [253 Cal.Rptr. 820], the reviewing court held such a claim subject to arbitration. The physician-patient agreement provided for arbitration of " 'any dispute as to medical malpractice.' " (*Id.* at p. 781.) The court concluded mandatory arbitration was "not only consistent with the language

decided in a court of law before a jury, and instead are accepting the use of arbitration." (§ 1295, subd. (a).)

In addition, the following advisement, printed in at least 10-point bold red type, must appear above the patient's signature line: "NOTICE: BY SIGNING THIS CONTRACT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DEDIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL. SEE ARTICLE I OF THIS CONTRACT."

of the statute [section 1295], but . . . essential to further the goals of the legislation and the judicially declared preference in favor of joining loss of consortium and negligence claims [citation]; safeguard the physician-patient relationship; and preserve important privacy rights of the patient." (*Ibid.*) The court further noted "[a] loss of consortium claim . . . 'is not merely derivative or collateral to the [patient-] spouse's cause of action [citation], . . . [but] is based on the physical injury or disability of [that individual].' " (*Ibid.*)

The *Gross* court engaged in an extensive discussion of policy, including that relating to the patient's right to privacy. "[I]n our view the most significant consideration, to authorize an intrusion into a patient's confidential relationship with a physician as the price for guaranteeing a third person, even a spouse, access to a jury trial *on matters arising from the patient's own treatment*, poses problems of a particularly serious nature. One might hope that spouses will voluntarily communicate with each other regarding their respective medical treatment, whether it involves a routine matter or a most intimate and sensitive procedure such as a vasectomy or the termination of a pregnancy. Nonetheless, it would be impermissible to adopt a rule that would require them, or their physicians, to do so, or that would permit one spouse to exercise a type of veto power over the other's decisions. Yet construing section 1295 to require a spouse's concurrence in an arbitration agreement would, in certain situations at least, have exactly that effect." (*Gross* v. *Recabaren*, *supra*, 206 Cal.App.3d 771, 782.) And the court concluded: "It would appear indisputable that if spouses disagree on any decision regarding the terms of medical treatment, including the desirability of an arbitration provision, the view of only one can prevail. Inasmuch as the patient is more directly and immediately affected, as between the two, the balance must weigh in that individual's favor." (*Id.*, at p. 783)

In *Bolanos* v. *Khalatian* (1991) 231 Cal.App.3d 1586 [283 Cal.Rptr. 209], the court, following *Gross*, reversed the trial court's order denying a health care provider's petition to compel arbitration of claims arising out of alleged negligent care rendered to a mother prior to and during the delivery of her child. Inter alia, the *Bolanos* court held the mother's signature to the arbitration agreement bound not only her and her infant, but the father as well. His alleged injury was emotional distress occasioned by his having witnessed the injuries inflicted on his wife. (See *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr.2d 72, 441 P.2d 912, 29 A.L.R.3d 1316].) The court reiterated the holding of *Gross*, that " '. . . where . . . a patient expressly contracts to submit to arbitration "any dispute as to medical malpractice," and that agreement fully complies with [ ] section 1295, it must be deemed to apply to *all* medical malpractice claims arising out of the services contracted

for, regardless of whether they are asserted by the patient or a third party.' [Citation.]" (*Bolanos* v. *Khalatian, supra,* 231 Cal.App.3d 1586, 1591.)

The *Bolanos* arbitration agreement was essentially identical to the one under consideration here: It provided, inter alia: " 'Article 2: All Claims Must be Arbitrated: It is the intention of the parties that this agreement bind all parties whose claims may arise out of or relate to treatment or services provided by the physician including any spouse or heirs of the patient.' " (*Bolanos* v. *Khalatian, supra,* 231 Cal.App.3d 1586, 1591.) The *Bolanos* court aptly stated: "Article 2 makes it clear that the agreement was intended to bind *all* parties whose claims arise out or relate[ ] to the treatment provided to [the patient]." (*Ibid.*)

More recently, in *Michaelis* v. *Schori, supra,* 20 Cal.App.4th 133, the reviewing court reversed an order denying a physician's motion to compel arbitration. The *Michaelis* agreement, containing a clause identical to those in *Bolanos* and in the instant case, was signed by a pregnant 17-year-old whose infant was subsequently stillborn. Following the reasoning of *Bolanos,* the court decided the arbitration agreement (1) was not subject to disaffirmance by reason of minority, and (2) was binding on the nonsignatory father of the baby.

Not all courts agree the spouse/patient may bind the nonsignatory spouse to arbitrate claims arising from the care and treatment rendered by the physician. In *Baker* v. *Birnbaum* (1988) 202 Cal.App.3d 288 [248 Cal.Rptr. 336], the court was "asked to decide whether a spouse who signs an agreement to arbitrate her medical malpractice claims thereby binds a non-signatory spouse to arbitration when the medical services for which the signatory spouse contracted were for herself only." (*Id.* at p. 291.) It concluded the nonsignatory husband was not required to arbitrate his loss of consortium claim because the agreement contained *no language extending to claims made by the husband on his own behalf.* As the court noted: "[I]t seems clear from paragraph 3 of the 1984 agreement that the submission to arbitration of any dispute as to medical malpractice refers to claims asserted by Mrs. Baker or *on her behalf.* The agreement further provides that if she signs the agreement 'on behalf of some other person for whom I have responsibility . . .' that person will also be bound. There is no need to interpret the legal effect of this language, as *there is no language in the agreement which would support a finding that it was signed on behalf of any person other than Mrs. Baker.*" (*Baker* v. *Birnbaum, supra,* 202 Cal.App.3d 288, 292, italics added.) Given those facts, the case could have been decided solely on the narrow basis of established contract law, under which the trial court's refusal to compel arbitration of the husband's claim was correct.

But the *Baker* court, harkening back to one of its earlier decisions, chose, unnecessarily, to rely on a far broader principle, i.e., "that the 'policy [in favor of arbitration] does not extend to those who are not parties to an arbitration agreement or who have not authorized anyone to act for them in executing such an agreement.'" (*Baker* v. *Birnbaum*, *supra*, 202 Cal.App.3d 288, 291.) In *Byerly* v. *Sale* (1988) 204 Cal.App.3d 1312 [251 Cal.Rptr. 749], this court declined to express any opinion "concerning the soundness of the [*Baker*] rule" (*id.* at p. 1315, fn. 2), because the appellants did not challenge the propriety of the lower court's order directing arbitration of the husband's loss of consortium claim. The time has come for us to express such an opinion.

Initially, we note Division Two of the Second District, when placed in the "unhappy position of having to choose between the decisions of two of our colleagues," (*Baker*, decided by Div. Four, and *Herbert* v. *Superior Court* (1985) 169 Cal.App.3d 718 [215 Cal.Rptr. 477], decided by Div. Five), rejected the *Baker* line of reasoning, finding *Herbert* "more appropriately treats with the practical realities of the situation and more accurately reflects existing case law governing the applicability of arbitration agreements to non signatories." (*Gross* v. *Recabaren*, *supra*, 206 Cal.App.3d 771, 780.) Next, we observe *Baker*, which has generally been ignored or questioned, constitutes a minority view, with its overly restrictive reading of the scope of arbitration agreements. (See *Keller Construction Co.* v. *Kashani* (1990) 220 Cal.App.3d 222, 226, fn. 3 [269 Cal.Rptr. 259].) But more importantly, we find compelling the reasons set forth in *Gross* and its progeny, for requiring nonsignatory spouses to arbitrate their claims arising out of injuries suffered by the signatory spouse.

Two competing rights are at stake: the patient's right of privacy and the spouse's right to jury trial of a treatment-related claim. Without trivializing the latter right, we believe the *Gross* court's focus was most appropriately placed on the sanctity of the physician-patient relationship—a safe haven which would be severely threatened if the physician were obliged to obtain the signature of the patient's spouse to the arbitration agreement. As the *Gross* court noted: "The significance of a patient's personal privacy rights with respect to medical matters is accorded special protection by the Legislature. [Citations.] [¶] In addition, the California voters in 1972 amended article I, section 1 of our state Constitution to include among the various 'inalienable rights' that of 'pursuing and obtaining . . . privacy.' The 'zones of privacy' created by this amendment 'extend to the details of one's medical history' [citation], '. . . an area of privacy infinitely more intimate, more personal in equality and nature than many areas already judicially recognized.' [Citation.]" (*Gross* v. *Recabaren*, *supra*, 206 Cal.App.3d 771, 782.)

*Gross* points to problems inherent in a rule that would require a spouse's signature to the physician-patient arbitration agreement: "It is true a physician may inquire into, and if honestly answered ascertain, a patient's marital status at the time of the initial visit, but relationships change. Consequently, to insure the inviolability of an arbitration agreement a doctor, at a minimum, would be required to reinterrogate the patient at every visit, and postpone further treatment if a recently acquired spouse is not present to join in the execution of a new agreement. We have previously rejected such a potential solution as unworkable and undesirable . . . and one which would appear certain to have a deleterious effect on the physician-patient relationship." (*Gross* v. *Recabaron, supra,* 206 Cal.App.3d 771, 782.) *Gross* notes other potential problems: "[W]ere patients to be less than candid concerning their marital status, should their duplicity be permitted to involuntarily expose to the expense and trauma inherent in a civil suit those whom they ask to minister to their medical needs? On the other hand, were we to protect the physician from such deception, would we not be allowing mendacity to achieve that which integrity could not, i.e., the binding of a nonsignatory to an arbitration agreement?" (*Ibid.*) How is a patient to maintain privacy in his or her physician consultations when, in essence, a spouse's intrusion into the relationship is a prerequisite to its formation?

Moreover, if a spouse with a loss of consortium claim were allowed to litigate that claim, the purpose of section 1295 would be defeated, for the patient would be compelled to arbitrate, but the physician would still have to answer in a civil suit for claims dependent on identical facts regarding the professional standard of care, its breach by the defendant and causation of injury to the patient. No savings would be effected, and there would be the potential for an anomalous result: the patient might fail to establish liability in arbitration, while the nonsignatory spouse might prevail in the loss of consortium action.

Mary's agreement with her physician provided for arbitration of *all* claims arising out of or relating to Sinclair's medical treatment or services, including the claims of any spouse or heir. There is no question the agreement was intended to define and bind those individuals with a potential cause of action if negligent treatment of Mary resulted in her injury or death. (See *Weeks* v. *Crow* (1980) 113 Cal.App.3d 350, 353 [169 Cal.Rptr. 830].) Gary's loss of consortium claim is based on Mary's injury or disability allegedly resulting from Sinclair's professional negligence. An order compelling arbitration of Gary's claim is consistent with the language of the statute, subserves the legislative goals underlying section 1295, protects Mary's right to privacy in her relationship with her physician and ensures that no third party will be able to intrude into that relationship or veto Mary's choices. In the balance,

Mary's right to decide the terms of her medical treatment outweighs Gary's right to a jury trial of his loss of consortium claim.

The order denying Sinclair's petition to compel arbitration is reversed. The case is remanded and the trial court is directed to enter an order granting Sinclair's petition. Sinclair shall recover his costs on appeal.

Sills, P. J., and Crosby, J., concurred.